UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DANIEL DANCY, # 803008

        Petitioner,         Case No. 15-cv-10518

v         Honorable Thomas L. Ludington

KENNETH T. MCKEE,

        Respondent.
_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DENYING CERTIFICATE OF APPEALABILITY, AND DENYING PERMISSION TO APPEAL IN FORMA PAUPERIS**

This is a habeas corpus petition filed by a state prisoner under 28 U.S.C. § 2254. Petitioner, Daniel Dancy, is serving a sentence of 12½ to 25 years in prison as well as lesser terms for his Wayne Circuit Court jury trial convictions of (1) assault with intent to commit murder in violation of M.C.L. § 750.83, (2) assault with intent to commit armed robbery in violation of M.C.L. § 750.89, (3) first-degree home invasion in violation of M.C.L. § 750.110a(2), and (4) possession of a firearm during the commission of a felony in violation of M.C.L. § 750.224b. Dancy now seeks habeas review of his State conviction. *See* ECF No. 1.

In his petition, Dancy claims that his trial counsel was ineffective for failing to present expert testimony regarding the unreliability of eyewitness identification, failing to impeach prosecution witnesses with their prior inconsistent statements regarding drug use, and failing to challenge the reliability of the prosecution witnesses' identification testimony because of their drug use. Because Petitioner's claims were reasonably adjudicated on the merits by the state courts Dancy's petition will be denied. Dancy will also be denied a certificate of appealability and permission to proceed on appeal in forma pauperis.

**I.**

**A.**

The evidence presented at trial indicated that on the night of November 15, 2010, Daisy Sanders was exiting her Detroit home when she was approached by two men, one of which was armed with a handgun. ECF No. 8, Ex. 7 at 27-29. The armed man hit Sanders on the head with the gun, kicked her, and forced her back inside the home while demanding money. *Id.* at 30-32. Sanders testified that it was dark outside, but that a motion sensor triggered a light from the driveway. *Id.* at 81-84. The man pushed Sanders up the stairs to the second story of the home while holding the gun to her head. *Id.* at 33-38. He threatened to kill her if she or her family did not produce money, contin ued to kick and beat her with the gun, and then shot her in the leg twice. *Id.*

Ms. Sanders lived with her sister Rosie Gray, her niece Keesha Gray, and Keesha's children. Ms. Sanders' family members retreated into their bedrooms and locked their doors when they heard the commotion. *Id.* at 35, 93-99. The gunman fired a shot that went through the door of Keesha Gray's bedroom, but neither Keesha Gray nor her children were struck. *Id.* The children called 9-1-1. *Id.* at 94. There was then a loud crashing noise, causing the gunman to retreat from the home and flee the scene with the other man, who never entered the house. *Id.* at 38.

The loud crash was Rosie Gray jumping down from the second floor porch onto the patio below. *Id.* at 115-117. She landed on a glass table, shattering it, and then ran to a neighbor's house. *Id.* at 118. As the gunman and his accomplice fled from the house, Rosie Gray testified that she saw the gunman fire two shots up towards the window of the bedroom where Keesha Gray was yelling outside for help. *Id.* at 94-97.

When the police arrived Ms. Sanders described both the perpetrators as black males, in their early 20's, about 5'10" tall, with slim builds. *Id.* at 155-56. Rosie Gray, in turn, described the gunman to the police as being 5'7" to 5'9". *Id.* at 128-29. She denied describing the shooter as 5'10", and testified that she had said 5'6". *Id.* at 79-80. In fact, Petitioner is only 5'2". *See* ECF No. 1, Appx. A. Upon entering Ms. Sanders's home Police officers discovered seventeen small baggies of marijuana and four medium baggies of marijuana in Rosie Gray's bedroom. ECF No. 8, Ex. 8 at 7-30. Rosie Gray admitted that she sold marijuana and recognized that she had been putting her family members in danger by her activities. ECF No. 8 Ex. 7 at 140-42.

Ms. Sanders's home had a surveillance system, with cameras in the front entry of the home and one in the backyard. Police officers copied and processed video from the cameras but were unable to make out the facial features of the two perpetrators. ECF No.8, Ex. 7 at 102-06; ECF No. 8, Ex. 8 at 39-46.

**B.**

Police officers showed several photo arrays to Sanders and Gray in the days after the incident. Officers continued to show the witnesses photo arrays whenever similar crimes occurred, but the witnesses never identified suspects from the photo lineups. ECF No. 8, Ex. 7 at 87-88, 119-20; ECF No. 8, Ex. 8 at 54-57. Petitioner's photograph was not in any of these photographic arrays. ECF No. 8, Ex. 7 at 119-20.

In July of 2011, Ms. Sanders was watching a television program called Crime Stoppers in which a photo of Petitioner was shown. *Id.*. at 45-46. She testified that she trembled when she saw Petitioner's photograph on the television and contacted Rosie Gray, and told her that she had seen the gunman on the show. *Id.* at 120. Rosie, who had videotaped the show, watched it and then contacted police. ECF No. 8, Ex. 8 at 57, 120, 138. The police created more photo arrays,

and both Ms. Sanders and Rosie Gray picked Petitioner out of separate photo arrays. *Id.* at 58-60, 120-21.

## C.

Ms. Sanders testified that Petitioner was the gunman, and that she could identify him from his face and eyes. ECF No. 8, Ex. 7 at 31, 46, 77, 88. Rosie Gray testified that she saw the gunman on the night of the incident as she ran across the street while the gunman was firing up at her daughter's window, but that she never saw his face. *Id.* at 145. Rosie Gray apparently picked Petitioner's photo from the lineup based on Ms. Sanders' identification of the shooter from the news program, rather than her own identification of the man she personally saw committing the crime. ECF No. 8, Ex. 8 at 133-35. Based partially on the witness testimony a jury convicted Dancy of assault with intent to commit murder in violation of M.C.L. § 750.83, assault with intent to commit armed robbery in violation of M.C..L § 750.89, first-degree home invasion in violation of M.C.L. § 750.110a(2), and possession of a firearm during the commission of a felony under M.C.L. § 750.224b. Petitioner was then sentenced to 12½ to 25 years' imprisonment. *See* ECF No. 8. Ex. 10.

Following his conviction and sentence, Petitioner appealed to the Michigan Court of Appeals. His appellate counsel argued that Petitioner had been denied his constitutional right to a fair trial and to effective assistance of counsel because Petitioner's trial counsel had failed to appoint an expert to testify about eyewitness testimony. *See* ECF No. 8, Ex. 11. In addition to his counsel's brief, Petitioner submitted a supplemental *pro se* claim arguing that his trial counsel had been ineffective for failing to impeach Ms. Sanders and Rosie Gray with prior inconsistent statements to the police and their admissions of marijuana use and for failing to challenge Ms. Sanders' and Rosie Gray's identification of Petitioner based on their drug use.

The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished opinion. *See People v. Dancy*, No. 309319, 2013 WL 2662480, at *1 (Mich. Ct. App. June 13, 2013), ECF No. 8 Ex. 11. Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court raising the same claims, which was denied. *See People v. Dancy*, 839 N.W.2d 461 (Mich. 2013), ECF No. 8 Ex. 12.

**II.**

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases: An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court adjudication is contrary to Supreme Court precedent under § 2254(d)(1) if (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or (2) " the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result]." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (internal quotation marks omitted). A state court adjudication involves an unreasonable application of federal law under § 2254(d)(1) if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008) (internal quotation marks omitted).

"In order for a federal court to find a state court's application of [Supreme Court] precedent unreasonable, the state court's decision must have been more than incorrect or erroneous," but rather "must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotations and citations omitted):

> [E]ven clear error will not suffice. Rather, as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (citations, quotation marks, and alterations omitted). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). "Federal habeas review thus exists as 'a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.'" *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011)). "[W]hether the trial judge was right or wrong is not the pertinent question under AEDPA." *Renico v. Lett*, 559 U.S. 766, 778 n.3 (2010). Rather, the pertinent question is whether the state court's application of federal law was "objectively unreasonable." *White*, 134 S. Ct. at 1702. In short, the standard for obtaining federal habeas relief is "difficult to meet . . . because it was meant to be." *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013) (internal quotation marks omitted).

Petitioner now raises three allegations of ineffective assistance of counsel. He claims that his counsel should have (1) presented expert testimony regarding the unreliability of eyewitness identification, (2) impeached Sanders and Gray with prior inconsistent statements regarding their marijuana use, and (3) challenged Sanders and Grays' identification testimony on the grounds

that they were using drugs at the time of the offense. All three of these claims have been reasonably decided by the Michigan Court of Appeals on the merits. *See Dancy*, 2013 WL 2662480, at *2.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a habeas petitioner's counsel was ineffective. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel guaranteed by the Sixth Amendment. *Id*. at 687. Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial. *Id*.

With respect to the performance prong, a petitioner must identify acts that are "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The Court's scrutiny of counsel's performance is viewed through a highly deferential lens. *Id*. at 689. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id*. at 690. And it is the petitioner who bears the burden of overcoming the presumption that his counsel's actions constituted sound trial strategy. *Id*. at 689.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id*. "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper

functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Id*. at 686.

Because the state courts rejected this claim on the merits, however, it is beyond the scope of review for this Court to evaluate Petitioner's claim de novo under the *Strickland* standard. The issue here is a narrower one. The question is whether the conclusion reached by the state court falls within the bounds of reasonable adjudications of Petitioner's claims — a substantially higher threshold. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123.

**A.**

Petitioner first claims that his counsel should have presented expert witness testimony regarding the reliability of eyewitness identification testimony. The Michigan Court of Appeals specifically addressed and rejected this claim under a reasonableness standard as follows:

> Here, because the video surveillance was so poor, the verdict depended on the reliability of the eyewitness testimony. Dancy's lawyer thoroughly covered the flaws in the identification testimony during cross-examination and closing arguments. He even told the jury that an expert on identification was unnecessary, essentially because the flaws were so obvious. Moreover, we can conceive of reasons that might lead a reasonable lawyer to forego an expert on eyewitness testimony. Dancy's lawyer might have thought that an expert was unnecessary given the obvious flaws in the eyewitness testimony and, for that reason, might have reasonably concluded that the expert's testimony would distract, annoy, or bore the jury. Therefore, on this record, Dancy has not overcome the presumption that his trial lawyer's decision to forego an expert on eyewitness testimony fell within the range of reasonable professional conduct. *Id*.
>
> At trial, Dancy's lawyer conceded that someone committed the crimes at issue, but argued that the eyewitnesses misidentified Dancy as that man. To that end, Dancy's lawyer explored the inconsistencies between the witnesses' past statements and their testimony during cross-examination and closing arguments. And an officer testified regarding their initial description of the perpetrator as significantly taller. Although Dancy might have preferred a harsher or more extensive cross-examination on these issues, a reasonable lawyer might conclude

> that such a course of cross-examination would alienate the jury and was otherwise unnecessary. *See, e.g, People v Nickson*, 120 Mich App 681, 686 & n 2; 327 NW2d 333 (1982).

*Dancy*, 2013 WL 2662480, at *2.

As explained by the Michigan Court of Appeals, Petitioner's trial counsel made a reasonable strategy decision regarding his challenges to the eyewitness testimony. Although counsel did not call an expert witness on the issue of eyewitness identification, trial counsel effectively challenged Sanders and Grays' identification testimony by using the witnesses' prior inconsistent description of the perpetrator. Furthermore, an officer testified regarding their initial description of the perpetrator as significantly taller." *Dancy*, 2013 WL 2662480, at *1. "[N]o precedent establishes that defense counsel must call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the Sixth Amendment." *Perkins v. McKee*, 411 F. App'x. 822, 833 (6th Cir. 2011); see also *Dorch v. Smith*, 105 F. App'x. 650, 653 (6th Cir. 2004) (upholding as reasonable the Michigan Court of Appeal's conclusion that defense counsel's failure to call an expert witness on eyewitness identification did not satisfy *Strickland*, because counsel "presented several witnesses who testified as to [the habeas petitioner's] whereabouts on the weekend of the incident" and cross-examined the eyewitness regarding inconsistencies in his identification of the petitioner).

Because counsel elicited testimony to discredit the identification testimony of Ms. Sanders and Rosie Gray, Petitioner was not denied effective assistance of counsel due to his trial counsel's failure to seek the assistance of an expert witness on identification. See *Greene v. Lafler*, 447 F. Supp. 2d 780, 794-95 (E.D. Mich. 2006).

**B.**

Counsel also did not provide ineffective assistance by failing to impeach Ms. Sanders and Rosie Gray with prior inconsistent statements regarding their marijuana use, or by failing to suggest that marijuana use affected their identification of Petitioner. As explained by the Michigan Court of Appeals:

> Dancy's lawyer also explored the fact that the witnesses might have been involved with drugs. He elicited testimony that one witness had sold marijuana from the home. He used this evidence to argue that the robbery may have been a drug house robbery and he suggested that the witnesses' identification testimony was unreliable because they were under the influence of marijuana. He did not ask the witnesses whether they smoked marijuana that day; however, the primary eyewitness had previously testified that she did not and there is nothing on the record indicating Dancy's lawyer could have proven otherwise. Therefore, the decision to proceed in this way might have been the most effective strategy available to Dancy's lawyer.

*Dancy*, 2013 WL 2662480, at *2.

This decision is consistent with the record evidence. At the preliminary examination Ms. Sanders testified that she and Rosie Gray "smoke weed," but she did not testify that she had used marijuana on the date of the incident. ECF No. 8, Ex. 2 at 27. At trial, defense counsel attempted to show that Ms. Gray was ashamed that her marijuana business led to a robbery, and he argued the witnesses' marijuana use could be considered when determining the reliability of their identification testimony. *See* ECF No. 8, Ex. 7 at 125, 140-46; ECF No. 8, Ex. 8 at 84. Contrary to Petitioner's assertions, there is no record evidence that the witnesses gave prior inconsistent statements regarding marijuana use on the date of the incident. Petitioner's trial counsel was not ineffective in the manner in which he used the marijuana evidence in support of Petitioner's defense. More to the point, the state appellate court's rejection of Petitioner's ineffective assistance of counsel claim did not amount to an unreasonable application of the *Strickland* standard.

### III.

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell,* 537 U.S. 322, 327 (2003). In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. *Id.* at 336-37. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

Having considered the matter, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right. Accordingly, a certificate of appealability is not warranted in this case. The Court further concludes that Petitioner should not be granted leave to proceed *in forma pauperis* on appeal, as any appeal would be frivolous. *See* Fed. R. App. P. 24(a).

**IV.**

Accordingly, it is **ORDERED**, that Petitioner Dancy's petition for a writ of habeas corpus, ECF No. 1., is **DENIED**.

It is further **ORDERED** that a certificate of appealability is **DENIED.**

- 11 -

It is further **ORDERED** that permission to proceed on appeal in forma pauperis is **DENIED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: June 15, 2016

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 15, 2016.

s/LISA WAGNER
Lisa Wagner Acting in the Absence of
Michael A. Sian, Case Manager

---